CHARLES J. WILLE, petitioner-appellant,

*v.*

LENA WILLE, defendant-respondent.

[Submitted November term, 1917. Decided March 4th, 1918.]

1. The motives which induce a husband to seek divorce from an unfaithful wife cannot properly have any material bearing upon his legal right to a divorce.

2. A husband is legally justified in using any and all lawful means to procure testimony so as to enable him to get rid of a wife whom he has reasonable grounds to believe is guilty of infidelity.

3. While the motive of a husband suing for a divorce might properly be the subject of inquiry, if he offers himself as a witness, for the purpose of testing his credibility, it cannot of itself bar his legal right to a divorce.

4. On examination of the evidence in this case *held* that the petitioner is entitled to a decree for divorce.

On appeal from a decree of the court of chancery advised by Vice-Chancellor Lane.

*Messrs. Kalisch & Kalisch (Samuel Kalisch, Jr.,* of counsel), for the appellant.

*Messrs. Howe & Davis,* for the respondent.

The opinion of the court was delivered by

KALISCH, J.

The appellant filed a petition for divorce against his wife, the respondent, in the court of chancery, alleging that she did, on the 18th day of May, 1917, commit adultery with a man whose name was unknown to the appellant, at West Orange, in this state.

The wife, in her answer to the petition, denied the alleged adultery.

The learned vice-chancellor, after hearing the cause, dismissed the petition for divorce upon the ground that the petitioner had not borne the burden of proof on him necessary to establish to the satisfaction of the court that the respondent had committed the adultery charged in the petition.

The reasons given by the court below in coming to this conclusion, as gleaned from the opinion, appear to be, first, that there was not only on the husband's part the motive of getting rid of an unfaithful wife, but there was a further motive of getting rid of her so that he might carry out obligations to another woman.

The motives which induce a husband to seek a divorce from an unfaithful wife cannot properly have any material bearing upon his legal right to a divorce, if the adultery charge be proved, either by direct or circumstantial evidence.

A husband is legally justified in using any and all lawful means to procure testimony so as to enable him to get rid of a wife whom he has reasonable grounds to believe is guilty of infidelity.

While the motive of a husband suing for a divorce might properly be the subject of inquiry, if he offers himself as a witness, for the purpose of testing his credibility, it cannot of itself bar his legal right to a divorce.

The testimony discloses that husband and wife had been living in a state of separation since the 5th day of July, 1915, by practically, mutual consent.

The testimony is plenary that the wife was possessed of an ungovernable temper, used foul and filthy language, and was given, as evidenced by her letters and postal cards to her husband during their separation, to lewd and obscene thoughts. These writings are not only couched in the most filthy terms imaginable, but express a malignant hatred of the wife toward her husband.

It is also manifest from the testimony that the wife was jealous of her husband, and accused him of undue familiarity with women, especially with Mrs. Newman. The latter was di-

vorced from her husband and was in the employ of the appellant as bookkeeper in his garage business. She was the sister of the wife of the appellant's brother, and the latter was in the employ of the appellant, at one time, as a taxi-cab driver. A quarrel disrupted the friendly relations between the brothers, and they became estranged, and this circumstance may readily account why the appellant's brother and the latter's wife appeared as witnesses for the respondent, and for the nature of their testimony.

For it was from these two witnesses' lips that came the statement that the appellant had promised to marry Mrs. Newman upon the former obtaining his divorce.

There is nothing, however, in the testimony of either witness which, fairly considered, tends to prove anything more than a friendship and familiarity which might properly have existed between the appellant and Mrs. Newman, in view of the family relation of all the parties above referred to.

The finding of the court below that the appellant failed to sustain the burden of proof necessary to establish the wife's adultery, does not appear to be borne out by the facts and circumstances proved in the cause. The undisputed facts are: The husband had heard, through talk in the neighborhood where his wife lived, that she was in the habit of receiving men visitors in her apartment at night. As a result of this information, the husband applied to a detective agency, in the city of Newark, to have the apartment and the conduct and movements of his wife watched.

It appears that the detective agency undertook the task and assigned several men for that purpose, but at the request of the appellant, on account of the expense involved, all were withdrawn from prosecuting the work except one Smith. Smith continued to watch the apartment and on two or three occasions he sent for the husband and they both testify they saw a light in the kitchen but in no other part of the apartment, and saw a man coming out of the front door of the house at eleven-thirty at night.

Smith further testified, that during his hours of watch, which were generally on Tuesdays and Fridays, at night, during the

months intervening between the middle of January and the 18th day of May following, when the raid was made, he saw two different men of whom he gives descriptions, enter, on those Tuesdays and Fridays, at night, and remain about two hours, in the wife's apartment. Smith further testified that on the evening of the 18th day of May, at about eight forty-five he saw a man enter the house; the lights were lit when he entered and remained so, when the witness boarded a car and went to the appellant's place of business and informed him of what he had seen, and, thereupon, the appellant asked a Mr. Shearer, who was in the appellant's employ, to accompany him, and the three got into a motor car and were driven to the wife's residence.

Upon their arrival, Smith went upon the porch to ascertain whether there was anyone in the wife's apartment. There was no light in the kitchen, but there was one in the dining-room, and Smith stopped to listen and heard voices and the "rumpus of a bottle" as he calls it. He carried this information to the husband, who, thereupon, in company with Shearer, went upon the porch, and the three, the husband leading, behind him was Smith, followed by Shearer, entered the apartment by the rear door, through the kitchen, and proceeded to the dining-room, in which there was a light burning and from which room they could see into the parlor where they saw the appellant's wife in the act of rising suddenly, in the arms of a man, from a lounge or settee. The three witnesses differ in minor details as to what they saw, which is but natural, since they occupied different positions in the dining-room when the wife was overtaken in the act. When discovered, the man was without coat or hat and his clothing was in disarray, and he said, "Oh, my God" and ran for his hat and coat and left. The wife, going up to her husband, said: "I don't care if you did catch me, you didn't care for me anyhow." The wife denied that anything improper had taken place between her and her visitor. She admitted, however, that she laid her hands upon her husband, but inferentially denied that she made the statement attributed to her by her husband and his witnesses. She admitted that her visitor was sitting on the end of the settee or couch before her husband and his party entered, but claims that she was standing in the door-

way between the parlor and dining-room and that this visitor whom she calls Price had been there for more than two hours. She further says that Price told her that he heard an automobile and said, could it be some one looking for you, and when she replied, I don't know, he pushed up the shade and looked out. Thus, there is the additional statement, coming from the wife, that the shade in the parlor was down. The wife further admits that when her husband and party entered, Price seized his hat and coat and ran out.

Great stress has been laid upon the circumstances attending the discovery of the wife and her visitor in the situation described by the husband and his witnesses. It is said that the failure of the husband or detective to detain the wife's alleged paramour and to ascertain who he was, and for the husband tamely to let him go without any exhibition of the natural outbursts of the human passions at what he saw and the resentment that a husband would, in the circumstances, naturally feel, tend to raise the suspicion that the visitor's presence was due to the husband's connivance. But suspicion of the existence of the fact of connivance is not sufficient in law to make a finding that there was connivance. There must be credible evidence to support such finding. The court below did not make any such finding and it is difficult to comprehend how from the evidence and circumstances such a result could have been properly reached. In the first place there was no love existing any more between husband and wife. The wife despised and hated her husband, as is evinced by her letters and post cards to him. The husband knew the state of feelings of his wife towards him. Why, therefore, should he make any demonstration over her unfaithfulness to him? If he were playing a part he might have raved and stormed and assaulted her companion or done worse, when he found the pair in the compromising position above related, and it rather tends to strengthen the credibility of the story told by the husband and his witnesses in that no effort was made at any dramatic display of feelings by the husband which he did not in reality possess. It, however, does appear from the respondent's testimony that the appellant told one of the party to catch the man.

Further, it appeared that one Price, a salesman for Griffith & Co., sold a player-piano to the appellant who made a present of it to his daughter. This appears to be the only time that the appellant saw Price. By the wife it is claimed that it was Price who was in her apartment on the night that the raid was made, and who she claims came there for the purpose of tuning the piano.

For the respondent it is further claimed that there was no good reason for the appellant to charge in his petition that the wife's adultery was committed with a person unknown, because of the circumstance of the sale of the piano to the appellant by Price, as above mentioned, and from which it must be inferred that the appellant recognized Price and that the latter was there with the former's connivance. But this does not necessarily follow. It was an admitted fact that there was no light in the parlor and the man, whoever he was, held his head down and ran out. As all that did occur transpired in the shadow and during moments of excitement, it is not at all unlikely that the appellant did not recognize his wife's visitor as Price. Besides, it appears that Price, being produced as a witness by the respondent to establish her innocence of the charge of infidelity, not only denied intercourse with her but denied in most emphatic terms that it was he who was found in her apartment on the night of the raid.

There is credible testimony tending to establish that Price was the man who was in the apartment. It is evident, however, from his denial, that he must have relied upon a belief that he was not recognized by the husband, Smith or Shearer, who, as it incontrovertibly appears, from the evidence, did not enter the parlor but stood in the dining-room where a dim light was burning and where they could be recognized by Price. There is not a scintilla of proof in the cause connecting the appellant with Price's presence there that night, nor does the proof present any circumstance, reasonably, warranting any such inference.

We now approach a consideration of the evidence relied upon by the appellant as establishing the charge made against his wife in his petition.

The learned vice-chancellor appears to have discredited the appellant's testimony, corroborated as it was in all its essential details by Shearer, and by circumstances which were conceded to have existed, and by corroborating avowals made by the wife, in testifying in her own behalf, because Smith, the detective, in stating what he saw when he entered the dining-room, described the alleged guilty pair standing with their arms around each other, after having got up from the lounge or settee, which position the learned vice-chancellor thought was against human nature for a couple to have taken who were discovered in the act of sexual intercourse. How parties would naturally have acted under the circumstances which confronted the alleged guilty pair in the present case can only be a matter of the purest conjecture. Much would depend upon the temperament, social position, moral sense, presence of mind and state of nerves of the parties.

And it must be borne in mind that the position described by the detective was only momentary, for the paramour almost immediately seized his hat and coat and ran from the house.

We have not discussed the testimony of Boyle, because it appears to have little evidential value, if any.

Boyle was called as a witness by the respondent. From the reading of his testimony it is obvious that he treasured up resentment against the appellant. It appears that the latter caused the former's arrest upon some criminal charge. It also appears that other differences existed between them. Boyle testified that the appellant told him on one occasion that he offered money to one Foster to get the best of his wife. Boyle gives no satisfactory explanation why it was that the appellant told him this. The appellant denied that he ever made any such statement to Boyle. Foster being called as a witness and examined by the court, denied the truth of Boyle's statement.

Leaving out of consideration the testimony of the appellant and his witnesses and carefully analyzing the uncontroverted facts and circumstances we have this situation: Letters and postal cards written by the respondent to her husband revealing her lewd and obscene state of mind. The respondent's story, which is that on the night in question a Mr. Price called at about

eight-thirty o'clock for the purpose of fixing the pedal of her piano; that it took fifteen minutes to do the work; that he asked her permission to take off his coat, which she gave; that she went into the dining-room and he went into the kitchen and took from a package which he had brought five bottles of beer; that they went into the dining-room and he poured out a glass of beer for her and one for himself, but she refused to drink any; that he coaxed her to drink but she persisted in her refusal; that it was about ten-thirty o'clock when her husband and party appeared and walked into the dining-room; that Price was sitting on the end of the couch, while she was standing by the rocker opposite the piano and that Price had previously said that there was room for two where he was sitting; that when her husband entered the dining-room she heard him say to one of the party, "Catch that fellow;" that Price got up, picked up his coat and hat and ran out. Besides it appears that the shades in the parlor were down. It is manifest that the respondent took the visit of Price as a matter of course. She did not ask him to explain his conduct in bringing beer into her home and drinking it in her dining-room. She did not upbraid him for what he did or said to her and the story of her own behavior is not that of a virtuous woman. Price, according to the respondent's own story, was in her apartment two hours. Both were fully more than an hour in the parlor together. According to the respondent's own belief Price was there for no good purpose. Yet she harbored him.

There was ample evidence of inclination, time, opportunity and place. Her explanation of Price's presence and conduct and her own behavior refutes any reasonable hypothesis of innocence. Another fact should be adverted to which appears to be a strong link in the chain of circumstances pointing to the respondent's guilt. Price was called in her behalf as a witness. He denied that he was in her apartment on the night in question. If his presence there was free from guilt, there is no good reason why he should have denied it. The testimony tends to establish that he is the man who was there. The fact that Price, hurriedly, seized his hat and coat and made his escape, is a circumstance in itself which speaks loudly of guilt.

The decree of the court of chancery dismissing the petitioner's petition is reversed, and the record remitted, with directions to enter a decree for divorce for the petitioner according to the prayer of his petition.

As to the appeal from the decree allowing respondent's counsel an additional counsel fee of $150, the decree will be affirmed.

*For affirmance*—PARKER, WILLIAMS, TAYLOR—3.

*For reversal*—GARRISON, SWAYZE, TRENCHARD, BERGEN, MINTURN, KALISCH, BLACK, WHITE, HEPPENHEIMER, GARDNER—10.